1   DANIEL R. MCNUTT
Nevada Bar No. 7815
2   CARBAJAL & MCNUTT, LLP
625 South Eighth Street
3   Las Vegas, Nevada 89101
Telephone: (702) 384-1170
4   Facsimile: (702) 384-5529
drm@cmlawnv.com
5
Attorney for Plaintiffs
6   *Frias Holding Company*
*and Mark A. James*
7
## UNITED STATES DISTRICT COURT
8
### DISTRICT OF NEVADA
9

| | |
|---|---|
| 10   FRIAS HOLDING COMPANY, a Nevada corporation; and MARK A. JAMES, an individual, | Case No. 2:11-cv-00160-GMN-LRL |
| 11 | |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| 12 | |
| vs. | |
| 13 | |
| GREENBERG TRAURIG, LLP, a Nevada limited liability partnership; GREENBERG TRAURIG, P.A., a Florida professional association; SCOTT D. BERTZYK, an individual; DOES I through X; and ROE ENTITIES XI through XX, inclusive, | |
| 14 | |
| 15 | |
| 16 | |
| 17   Defendants. | |

18
COME NOW Plaintiffs, Frias Holding Company and Mark A. James, and complain
19
against Defendants, Greenberg Traurig, LLP, Greenberg Traurig, P.A., Scott D. Bertzyk,
20
DOES 1-X, ROE ENTITIES XI-XX, and each of them, as follows:
21
### THE PARTIES
22
1.     Plaintiff Frias Holding Company ("FHC") is, and at all times material hereto
23
was, a Nevada corporation authorized to transact business in the State of Nevada, with its
24
principal place of business located at 5010 S. Valley View Boulevard, Las Vegas, Nevada
25
89118.

2.      Plaintiff Mark A. James ("Mr. James") is, and at all times material hereto was, a resident and citizen of the State of Nevada, County of Clark.  Mr. James is a former State Senator, County Commissioner, and practicing attorney (Nevada Bar No. 3082).   He is currently the President and Chief Executive Officer of FHC.

3.      Plaintiffs are informed and believe, and thereon allege, that Greenberg Traurig, LLP ("GT LLP") is, and at all times material hereto was, a New York limited liability partnership authorized to transact business in the State of Nevada, with its principal place of business located at 3773 Howard Hughes Parkway, Suite 400 North, Las Vegas, Nevada 89169 (the "Nevada Office").

4.      Plaintiffs are informed and believe, and thereon allege, that Greenberg Traurig, P.A. ("GT PA") is, and at all times material hereto was, a Florida professional association authorized to transact business in the State of Nevada, with its principal place of business located at 1221 Brickell Avenue, Miami, Florida 33131 (the "Florida Office").

5.      Unless otherwise indicated, GT LLP and GT PA are jointly referred to herein as either "GT" or "Greenberg Traurig."

6.      Plaintiffs are informed and believe, and thereon allege, that at all times material hereto GT had shareholders who are residents and citizens of the State of Nevada, County of Clark, transacting business and performing legal services for and on behalf of GT out of the Nevada Office.  Two such shareholders are Mark G. Tratos, Esq. ("Mr. Tratos") and Michael J. Bonner, Esq. ("Mr. Bonner").

7.      Plaintiffs are informed and believe, and thereon allege, that Scott D. Bertzyk, Esq. ("Mr. Bertzyk") is, and at all times material hereto was, a resident and citizen of the State of California and a shareholder of GT, transacting business and performing legal services for and on behalf of GT primarily out of its California office, located at 2450 Colorado Avenue, Suite 400E, Santa Monica, California 90404 (the "California Office");

provided, however, that the wrongful acts and/or omissions complained of herein were committed, in part, by Mr. Bertzyk while transacting business and performing legal services out of GT's Nevada Office.

8.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES I-X and ROE ENTITIES XI-XX, inclusive, are presently unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names.  Plaintiffs will seek leave to amend this Complaint to reflect the true names and capacities of said Defendants when ascertained.  Plaintiffs are informed and believe, and thereon allege, that at all times material hereto DOES 1-X and ROE ENTITIES XI-XX, and each of them, is legally responsible in some manner for the unlawful acts alleged herein and injuries and damages caused thereby.

9.     Plaintiffs are informed and believe, and thereon allege, that at all times material hereto Defendants GT LLP, GT PA, Mr. Bertzyk, DOES 1-X, and ROE ENTITIES XI-XX, and each of them, were acting as an agent and/or employee of each of the other Defendants (*e.g.*, Mr. Bertzyk was acting as an agent and/or employee of GT LLP, GT PA, DOES 1-X, and ROE ENTITIES XI-XX) and within the course and scope of said agency and/or employment with full knowledge and consent of each of the other Defendants (*e.g.*, GT LLP, GT PA, DOES 1-X, and ROE ENTITIES XI-XX had full knowledge of and consented to the wrongful acts committed by Mr. Bertzyk as described herein).  Each of the wrongful acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants (*e.g.*, GT LLP, GT PA, DOES 1-X, and ROE ENTITIES XI-XX knew about and ratified Mr. Bertzyk's egregious misconduct).

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as the aggregate amount in controversy exceeds $75,000.00, exclusive of

interest and costs, and there is complete diversity between Plaintiffs and Defendants in this action. These amounts which are more specifically plead below are in addition to any recovery sought for disgorgement of attorneys' fees and attorneys' fees, costs, and interest arising out of this action.

11. The acts, transactions and events giving rise to Plaintiff's claims are largely based upon Defendants' conduct that occurred in Nevada.

12. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

13. This is an action against an international law firm which has, by the acts and omissions of one or more of its members, breached various duties owed to its clients, FHC and Mr. James.

14. As discussed more fully below, Greenberg Traurig and its member attorneys violated several duties owed to Plaintiffs, including, but not limited to, the duty to avoid impermissible conflicts of interest, when they chose to represent a third client with interests materially adverse to those of Mr. James, which representation further created a significant risk that the representation of FHC would be materially limited. Even worse, after the law firm learned of the conflict among their clients, GT decided to pursue Mr. James—its own client and the client representative of FHC—to collect on a receivable relating to work performed for the third client.

## GT Represents L.A. Pacific

15. On or about March 24, 2004, Louis Habash ("Mr. Habash"), through two of his entities, Hotels Nevada, LLC ("Hotels") and Inns Nevada, LLC ("Inns") (jointly, "Hotels & Inns"), as sellers, entered into an agreement with L.A. Pacific Center, Inc. ("LAP"), as buyer, for the purchase and sale of two adjoining parcels of commercial real property located

in Las Vegas, Nevada commonly known as Alexis Park Hotel and Americana Inns (the "Alexis Park Transaction").

16.    J. Douglas Driggs, Esq. ("Mr. Driggs") of the law firm of Santoro Driggs Walch Kearney Holley & Thompson represented Hotels & Inns in the Alexis Park Transaction; LAP was represented by Richard Kirkbride, Esq. ("Mr. Kirkbride") and Daniel J. Katz, Esq. ("Mr. Katz") of the law firm of Paul Hastings Janofsky & Walker ("Paul Hastings").

17.    Litigation arose out of the Alexis Park Transaction just over a year later, on May 4, 2005, when Hotels & Inns filed a complaint against LAP, among others, in the Superior Court of California, County of Los Angeles (Case No. BC332914), seeking, *inter alia*, to rescind the Alexis Park Transaction based on fraud (the "California Litigation"). LAP filed counter-claims against Hotels & Inns as well as against Mr. Habash individually in April 2006, alleging causes of action for abuse of process, slander of title, and intentional interference with contractual relations.

18.    On January 6, 2006, a related action was commenced by the filing of a verified complaint by Hotels & Inns and Silverleaf Development, LLC ("Silverleaf"), another entity owned by Mr. Habash, against LAP and Richard Alter ("Mr. Alter"), LAP's broker and/or representative and/or authorized agent in the Alexis Park Transaction, in the Eighth Judicial District Court, Clark County, Nevada (Case No. A515417C), alleging similar tort-based causes of action along with a real property claim (the "Nevada Litigation").  LAP likewise filed counter-claims in the Nevada Litigation against Hotels & Inns as well as against Mr. Habash individually in June 2006 for various tort and contract-based claims.

19.    The principal issue in both the California Litigation and the Nevada Litigation involved whether the sellers agreed to a 12-month or 60-month outside payment date (*i.e.*, a holdback of the outstanding balance of the purchase price) on March 24, 2004—the day Mr.

Habash signed the Alexis Park Transaction documents on behalf of the sellers—and as such, whether 12-month or 60-month documents were presented to and executed by the sellers in the Alexis Park Transaction (LAP prepared the transaction documents).

20. According to LAP, Mr. Habash agreed on behalf of Hotels & Inns to an outside payment date of 60 months and signed documents to this effect on March 24, 2004. By contrast, according to Hotels & Inns, Mr. Habash signed 12-month documents on March 24, 2004, and sometime thereafter, LAP secretly prepared 60-month documents and fraudulently altered or forged the original set of signed transaction documents to support the buyer's claims.

21. Mr. James, who at the time was an attorney with the law firm of Bullivant Houser Bailey, P.C. ("BHB") represented Hotels & Inns in both the California Litigation (appearing *pro hac vice*) and the Nevada Litigation.

22. Hotels & Inns were also represented in the California Litigation by, among others, Gary A. Dapelo, Esq. ("Mr. Dapelo") of the law firm of Good Wildman Hegness & Walley, Richard A. Derevan, Esq. ("Mr. Derevan") of the law firm of Snell & Wilmer, LLP, and Roger M. Franks, Esq. and Charles M. Clark, Esq. of the law firm of Jackson DeMarco Tidus & Peckenpaugh; and in the Nevada Litigation, by Joseph P. Hardy, Esq. ("Mr. Hardy"), also with BHB, and Will Kemp, Esq. ("Mr. Kemp") of the law firm of Harrison Kemp & Jones, LLP (now Kemp, Jones & Coulthard, LLP).

23. Greenberg Traurig's California Office, through GT partner Eric V. Rowen, Esq. ("Mr. Rowen"), first began work for LAP on or about May 1, 2006 in connection with both the California Litigation and the Nevada Litigation (substituting in place of Paul Hastings). Mr. Bertzyk was assigned to work on these matters upon joining GT's California Office as a shareholder on or about June 1, 2006. Although a California attorney, Mr. Bertzyk was admitted *pro hac vice* to represent LAP in the Nevada Litigation.

24.    Eric W. Swanis, Esq. ("Mr. Swanis"), from GT's Nevada Office, assisted Messrs. Rowen and Bertzyk with the Nevada Litigation, along with Terry Coffing, Esq. ("Mr. Coffing") and David T. Duncan, Esq. ("Mr. Duncan") of the law firm of Marquis & Aurbach ("M&A") (Mr. Duncan has since left M&A).

25.    Mr. Tratos, from GT's Nevada Office, also billed time (approximately 30 hours) to the LAP file and made occasional appearances at hearings in the Nevada Litigation, thereby acquiring first-hand knowledge that Mr. James was representing Hotels & Inns and was adverse to GT's client, LAP.

26.    As Mr. James would later learn, Paul Hastings and LAP surreptitiously executed a document entitled "Reservation of Rights and Tolling Agreement" on or about April 26, 2007 (amended on several occasions thereafter) (the "Tolling Agreement"), whereby Paul Hastings recognized that LAP had potential claims against Paul Hastings (*i.e.*, for legal malpractice, breach of fiduciary duty, and breach of contract) arising from services performed by Paul Hastings on behalf of LAP related to the Alexis Park Transaction, and thus, in exchange for unknown consideration, Paul Hastings agreed to a tolling of the statute of limitations with respect to any such claims that LAP had against that firm (more on this below).

### Mr. James Leaves BHB to Become President and CEO of FHC

27.    On or about December 16, 2006, Mr. James left his position with BHB to become President and CEO of FHC, owned at the time by a trust for the benefit of Phyllis M. Frias ("Ms. Frias"), who is the Director, Treasurer, and Secretary of FHC.  Mr. James had transitioned out of active involvement in the Nevada Litigation and the California Litigation by February 2007, after having battled for almost two years in the protracted litigation.

28.    FHC provides taxi and limousine services throughout Clark County, Nevada. FHC is a privately-held holding company, owning stock in and operating (through a

management company) five (5) taxi companies and two (2) limousine companies doing business in the State of Nevada; specifically, Ace Cab, Inc., Union Cab Co., A NLV Cab Co., Vegas-Western Cab, Inc., Virgin Valley Cab Co., Inc., Las Vegas Limousines, and Airline Limousine Corp.

29.     FHC is closely regulated by both the Nevada Taxicab Authority ("TA") and the Nevada Transportation Authority ("NTA"), and holds privileged licenses (*i.e.*, Certificates of Public Convenience and Necessity) to engage in various transportation services in intrastate commerce as a common carrier by motor vehicle.  These licenses are only provided to companies which continuously comply with the strict regulatory standards administered and enforced by these government agencies.

30.     Since joining FHC, Mr. James has been the face of the company throughout Las Vegas and the State of Nevada and—as President and CEO of FHC—is authorized to transact business on its behalf.

31.     In or around May 2009, Mr. James was found suitable and of good moral character by both the TA and the NTA to own stock in the FHC companies holding Certificates of Public Convenience and Necessity.  Although Ms. Frias remains the majority owner of FHC, Mr. James became the sole minority owner (his interest in FHC common stock vests over time and remains subject to forfeiture for specified reasons).

32.     Mr. James, in his capacity as President and CEO of FHC, regularly engaged Greenberg Traurig (specifically, Mr. Tratos) to perform various legal services for FHC.  Mr. James has known Mr. Tratos for years, dating back to when Mr. Tratos had his own law firm, Quirk & Tratos, which merged with GT's Nevada Office in May 2005.  Mr. James went to Mr. Tratos for legal services based on his long, deep and abiding trust in him.

33.     Mr. Tratos' work for FHC focused primarily on intellectual property, including, but not limited to, preparing trademark and copyright applications, asserting

infringement claims against third parties, and developing marketing strategies, dating back to at least September 2008, if not earlier.

34.     Mr. Tratos and other members of Greenberg Traurig knew that Mr. James was the President and CEO of FHC, and they interacted with Mr. James on a regular basis as part of performing legal services for FHC.

## Mr. Bertzyk Viciously and Unjustifiably Attacks Mr. James Before, During, and After the Arbitration

35.     The Nevada Litigation was stayed by the Nevada Supreme Court on October 22, 2008 (Case No. 47979), while the California Litigation was sent to arbitration in June 2008 with Judicial Arbitration and Mediation Services (JAMS Reference Proceeding No. 1260000795) (the "Arbitration").

36.     The Arbitration took place before a 3-member panel.  Each side initially pleaded its claims in late July 2008.  Dispositive motions were filed in August and September 2008.  Motions in limine were filed in December 2008 and January 2009.  Hearings took place during January and February 2009, with closing briefs presented in April 2009.

37.     The Arbitration was intense, to say the least, with countless, completely unfounded accusations by LAP against Hotels & Inns and their counsel (including Mr. James) of committing fraud, suborning perjury, and concealing or manipulating evidence to support the sellers' version of the facts.  Mr. Bertzyk was the principal proponent of LAP's baseless attack, taking advantage of every opportunity to directly charge Mr. James with wrongdoing and level malicious personal attacks against him.  Because Mr. James was not involved in the Arbitration and was unaware of Mr. Bertzyk's remarks about him (discussed below), he was not present to defend himself.

38.     In the Arbitration, LAP and its counsel, Mr. Bertzyk, wrongfully accused Mr. James of single-handedly fabricating a story to enable Hotels & Inns to take back the property after LAP had expended substantial sums of money improving it.

39.   What follows are examples of oral statements made by Mr. Bertzyk regarding Mr. James, each of which is false and defamatory (and none of which Mr. James knew about until much later):

a.   During an evidentiary hearing in the California Litigation on August 14, 2007 (after Mr. James left BHB to join FHC), Mr. Bertzyk stated as follows:

> May 17th is a real problem for them [the buyers].  This is when you're going to begin to find out who is playing straight with you and who is not.
> Mr. Driggs will tell you he handed his files over to the litigators in January 2005 and he's never taken them back since.
> So they [the files] have been in the hands of Mark James, who I'll talk about more, who is the original litigator on this case since January of 2005.  Free to do with [the files] what he wants.  Free to alter documents if he wants.  Free to throw out documents if he wants.
> And he did one of those two things with respect to what Santoro Driggs received on May 17th.
>
> *     *     *     *
>
> I don't know.  But I know either they[, *i.e.*, Mr. James,] manipulated a document or they tossed out the third fax.
>
> *     *     *     *
>
> Either someone on the respondents' [sellers] side – and I don't suppose we'll ever know who; I have a clear hunch – tossed out the third fax, or they combined two faxes into one.

b.   At a hearing on September 22, 2008 before the Arbitration panel, Mr. Bertzyk stated that a meeting arranged by Mr. Habash (on behalf of Hotels & Inns) with Mr. Alter to discuss the status of LAP's redevelopment of the property and final payment of the remainder of the purchase price was akin to "inviting Richard Alter into the lion's den to be interviewed by Mark James."

c.   At another hearing on October 23, 2008, Mr. Bertzyk recklessly accused Mr. James of concealing evidence and having clandestinely schemed to take back the property for months, even before he was asked to do so by his clients, Hotels & Inns.

d.     At the opening evidentiary hearing in the Arbitration on January 12, 2009, Mr. Bertzyk stated as follows:

> But whoever was involved, we [the buyer] know this.  And this you will hear from Doug Driggs and Louis Habash.  The main litigator at the time, Mark James, began conjuring legal theories to take this property back before Habash had ever told him a word.
>
> Now, I want you to think about that.  You're going to hear it from Habash.  Yep, James did all the talking.  I just listened.
>
> How can a lawyer be suggesting theories to take back property before his client has even told him what the story is?
>
> What better proof do you need that this was time to get back the property; how can we do it?
>
> I imagine the conversation went a lot like some of the stories you hear about lawyers defending criminals.  Now, before you tell me your story, here are some possibilities for a possible defense.  Now tell me what happened.

e.     During the same evidentiary hearing that took place on January 12, 2009, Mr. Bertzyk accused Mr. James of "ducking" a subpoena to avoid disclosing his files from the Alexis Park Transaction (received from Mr. Driggs) to LAP, which—according to Mr. Bertzyk—would have proved that Mr. James tampered with the evidence.  LAP had tried to subpoena Mr. James' file in or around early 2009, and went so far as to try to hold Mr. James in contempt of court for not cooperating.  Mr. Kemp, on behalf of Mr. James, advised Greenberg Traurig in February 2009—in no uncertain terms—that GT *knew* it had a conflict of interest by trying to get Mr. James—the client representative for FHC—held in contempt, because it was simultaneously representing FHC (at Mr. James' request) in Nevada.  Not surprisingly, the matter was quickly resolved because, on information and belief, Greenberg Traurig realized that it was acting improperly and in dereliction of its duties owed to its client, FHC.  As discussed below, Mr. Bertzyk was not fazed by this obvious and irreconcilable conflict—whose existence was now known by him—and would continue to aggressively pursue Mr. James.

f.     On February 24, 2009—one month after he was informed of the conflict—Mr. Bertzyk made express reference to Mr. James having "free rein to do whatever

he wanted to do" with Mr. Driggs' file from the Alexis Park Transaction, and that Mr. James did nothing "to preserve chain of custody as to those documents," suggesting directly, but without any evidence whatsoever, that Mr. James fraudulently altered the documents he received from Mr. Driggs when he first started working for Hotels & Inns against LAP.  Mr. Bertzyk went on to state as follows:  "I would – I do feel compelled to note this about Mark James.  This is an attorney who has evaded your orders.  This is an attorney who took evidence from the Bullivant firm.  This is an attorney who destroyed evidence.  That's the record.  That's the guy who was in control of these files."  Mr. Bertzyk then concluded that Mr. James had made representations to the court "at odds with the truth."

   g. During closing arguments before the 3-member Arbitration panel on April 28, 2009—three months after learning of the conflict—Mr. Bertzyk flatly accused Mr. James of conspiring against LAP with his clients, Hotels & Inns, and of committing multiple acts of "mischief" through the "doctor[ing]" of files.

  40. The same false and defamatory accusations about Mr. James' handling of Hotels & Inns' case were written by Mr. Bertzyk in briefs filed with the arbitrators; specifically:

   a. In LAP's Arbitration Trial Brief, filed January 9, 2009, Mr. Bertzyk stated that Mr. James "was free to massage [the transactional files] as he saw fit" months before the sellers "deemed their strategy fit for Broadway and rolled out their plan."  He later implied Mr. James was hiding the truth while all along "brandishing" false documents.

   b. In LAP's Post-Arbitration Brief, filed April 6, 2009, Mr. Bertzyk accused Hotels & Inns' counsel, *i.e.*, Mr. James, of conjuring up false claims "built upon bold untruths" and of altering key documents to support sellers' theory of the case.

1          c.      In LAP's Post-Arbitration Reply Brief, filed April 17, 2009, Mr.

2   Bertzyk referred to Mr. James as "one of the early masterminds behind [s]ellers' attempted

3   extortion."

4          41.     All of the above oral and written statements made by Mr. Bertzyk concerning

5   Mr. James are built on lies, fabrications and untruths.  Notwithstanding, as evident from these

6   statements, Mr. Bertzyk was unrestrained in the Arbitration in disparaging Mr. James'

7   character and defaming FHC's President and CEO.

8          42.     Since at least September 2008, FHC had been a client of Greenberg Traurig,

9   and during that time, GT had dealt with Mr. James as the client representative.  Not once did

10  Mr. Bertzyk—a partner of GT—consider whether his representation of LAP put his partner's

11  (Mr. Tratos') simultaneous representation of FHC at substantial risk, potentially jeopardizing

12  FHC's right to hold privileged licenses to do business in the State of Nevada, by disparaging

13  FHC's President and CEO (Mr. James) through publishing false and defamatory statements

14  of wrongdoing concerning him built on lies, fabrications, and untruths.

15         43.     Messrs. Kirkbride and Katz (attorneys from Paul Hastings) submitted various

16  declarations and presented testimony during the Arbitration to support LAP's theory of the

17  case as spawned by Mr. Bertzyk, *i.e.*, that Mr. Habash agreed on behalf of Hotels & Inns to a

18  60-month holdback provision on March 24, 2004 and executed 60-month (not 12-month)

19  transaction documents.  On information and belief, Messrs. Kirkbride and Katz, along with

20  Mr. Alter, were responsible for the preparation of the purchase and sale documents in the

21  Alexis Park Transaction on behalf of LAP and for the transmission of those documents to the

22  title and escrow companies for closing and recording purposes.  Although Hotels & Inns

23  repeatedly argued during the Arbitration that Messrs. Kirkbride and Katz were presenting

24  false and misleading testimony, Mr. Bertzyk portrayed these two attorneys as

25  "unimpeachable" and without any motive to lie.  As is shown below—and as is evident from

the Tolling Agreement—LAP and Mr. Bertzyk knew all along that Messrs. Kirkbride and Katz had committed errors on March 24, 2004 relating to the signed transaction documents.

**Mr. James Personally Becomes a Client of GT**

44.     As mentioned above, Greenberg Traurig, through Mr. Tratos, had represented FHC in Nevada since the latter half of 2008, if not earlier, and in so doing, frequently interacted with Mr. James as the client representative.  At no point did Mr. Tratos or other members of GT ever communicate with Mr. James or Ms. Frias regarding a conflict of interest that Greenberg Traurig had in representing FHC, while simultaneously attacking the character and integrity of its President and CEO, Mr. James—the very person with whom GT was working in its representation of FHC—during GT's representation of LAP in the Arbitration.

45.     On or about July 14, 2009, if not earlier, Mr. James personally engaged Greenberg Traurig (specifically, Mr. Bonner, a shareholder in GT's Nevada Office), to represent him personally in obtaining a gaming license in Nevada (Ms. Frias also engaged GT through Mr. Bonner to represent her in obtaining a gaming license).  Mr. James went to Mr. Bonner based on his long, deep and abiding trust in Mr. Bonner.

46.     On July 27, 2009, Mr. James executed an engagement letter with GT on behalf of FHC for representation in obtaining gaming licensing for the company.   The engagement letter expressly indicates that "the terms described in this letter will also apply to any additional matters that we handle on your behalf at your direction."  GT had already been doing work for some time representing the intellectual property interests of FHC.

47.     Mr. James signed an engagement letter for gaming license representation in his individual capacity on October 9, 2009, and the letter expressly indicates that the "effective date of this agreement will be considered to be retroactive to the date we [GT] first

provided legal services to you." The first date of service to Mr. James personally by Greenberg Traurig was in July 2009, if not earlier.

48. Mr. James had to disclose *everything* about himself—personally and financially—to Greenberg Traurig in connection with the preparation of his application for a Nevada gaming license. The application includes, for example, a detailed personal history of Mr. James and an exhaustive description of his assets and net worth. Several times Mr. James requested that Mr. Bonner (and only Mr. Bonner) handle this highly personal and sensitive information "with the utmost confidentiality."

49. In preparing Mr. James' gaming license application, one or more members of Greenberg Traurig compiled a litigation spreadsheet of all matters in which Mr. James had ever been involved. Notably, *the list included the Nevada Litigation*. Therefore, at the time GT agreed to represent Mr. James personally, Mr. Bonner and GT knew of the Nevada Litigation, including, without limitation, the scandalous allegations made therein by Mr. Bertzyk about Mr. James (which were built on lies, fabrications, and untruths). Mr. Bonner's partner, Mr. Tratos, *had actually made court appearances on behalf of LAP in the Nevada Litigation*, and likewise had first hand knowledge of Mr. James' prior involvement in the matter and the ongoing efforts of Mr. Bertzyk to maliciously destroy Mr. James (the President and CEO of GT's client, FHC). Notwithstanding this knowledge, Messrs. Tratos and Bonner did not advise Mr. James about an actual or potential conflict of interest with respect to GT's representation of FHC and Mr. James, on the one hand, and GT's simultaneous representation of LAP, on the other hand—where Mr. James (their own client and the client representative of FHC) was being vilified by his own lawyers without his knowledge.

50. Mr. Bonner had been a trusted friend and confidant of Mr. James for many years. In fact, Messrs. James and Bonner worked together for a period of time in late 1999 or

early 2000 at the law firm of Kummer, Kaempfer, Bonner, Renshaw & Ferrario (now Kaempfer, Crowell, Renshaw, Gronauer & Fiorentino). Not surprisingly, Mr. Bonner was named as a character reference on Mr. James' forthcoming Nevada gaming application.

51.    The Nevada State Gaming Control Board ("GCB") and Nevada Gaming Commission ("NGC") will only license individuals with impeccable records of good character, honesty and integrity. Someone who allegedly has no qualms about perjuring himself or manufacturing or concealing evidence is not presumptively qualified to hold such a privileged license. While Mr. Bonner was preparing to present Mr. James to the GCB and NGC as an extremely well-qualified candidate suitable to be licensed in Nevada, Mr. Bonner's partner, Mr. Bertzyk, was presenting a much different version of Mr. James' character to the 3-member panel in the Arbitration. In fact, the versions of Mr. James being presented by these two Greenberg Traurig attorneys were and are irreconcilable.

52.    Mr. James' gaming application was not submitted to the GCB or NGC because the underlying transaction giving rise to the need for Mr. James to get licensed, *i.e.*, FHC's purchase of property with on-site gaming machines, fell through. Nevertheless, Greenberg Traurig kept Mr. James' file open at his request and did not terminate their individual attorney-client relationship with him.

## The Arbitration Concludes in Favor of LAP

53.    While Mr. Tratos was doing intellectual property work for FHC (at Mr. James' request), and while Mr. Bonner was representing Mr. James personally in regard to his obtaining a Nevada gaming license, on July 27, 2009, the 3-member panel issued its interim Arbitration award. In brief, the panel accepted LAP's contrived version of the facts as true (finding Messrs. Kirkbride and Katz, among others, to be more credible than Messrs. Driggs and Habash) and awarded damages against Hotels & Inns in excess of

$140,000,000.00.  LAP (as the prevailing party) was ordered to submit a separate affidavit in support of its motion for attorneys' fees and costs.

54.     At this point, Mr. James was, without question, personally a client of Greenberg Traurig.  Yet, unbeknownst to Mr. James, Mr. Bertzyk's personal vendetta against him did not subside, but instead, escalated.  What happened next is startling, if not disturbing.

55.     On July 31, 2009, Mr. Bertzyk submitted to the 3-member Arbitration panel his affidavit in support of fees and costs.  But the document did much more than simply itemize and detail the costs and fees associated with the work he and others from Greenberg Traurig performed on behalf of LAP.  Mr. Bertzyk makes specific reference to Mr. James— his firm's own client and the client representative of FHC—as one of Hotels & Inns' cohorts; declares that Mr. James and others "litigated this case with venom and a vengeance on a rare level"; and states definitively that Hotels & Inns, through their counsel, (i) misrepresented the truth, (ii) withheld relevant evidence, (iii) planted false evidence, (iv) altered or destroyed evidence, and (v) misled or subverted justice.

56.     On September 4, 2009, Hotels & Inns filed a Motion to Re-Open the Proceedings in the Arbitration.  On September 9, 2009, LAP, through Mr. Bertzyk, filed an Opposition to Hotels & Inns' Motion, and again attacked Hotels & Inns' "cohort of lawyers," including Mr. James— his firm's own client and the client representative of FHC—who were allegedly "willing to manufacture evidence, lie and mislead" the 3-member Arbitration panel, as well as suborn perjury.

57.     Not once did Mr. Bertzyk consider whether his actions conflicted with Mr. Bonner's simultaneous representation of Mr. James and/or Mr. Tratos' simultaneous representation of FHC.

58.     The 3-member Arbitration panel issued its final award on October 27, 2009. On February 25, 2010, the court in the California Litigation granted LAP's petition to confirm the Arbitration award, which is now on appeal.

**Mr. Bertzyk Solicits Hotels & Inns to Sue Its Former Attorneys, Including Greenberg Traurig's Own Client and the Client Representative of FHC, Mr. James**

59.     LAP purportedly incurred nearly eight million dollars in legal fees stemming from the protracted legal battle over the Alexis Park Transaction, most of which was unpaid and remains owed to Greenberg Traurig.  On information and belief, this put Mr. Bertzyk in a very difficult position for himself and with his firm, having a receivable from LAP nearing $8,000,000.  Hotels & Inns filed for bankruptcy protection in Nevada in or around November 2009, halting any immediate attempts by LAP to collect on its judgment from these two entities.  Mr. Bertzyk thus had to begin looking for deep pockets in order to get LAP (and himself) paid.  Mr. James— his firm's own client and the client representative of FHC— became his primary target.

60.     Even before the Arbitration panel issued its final award, Mr. Bertzyk began communicating with Arthur F. Stockton, Esq. ("Mr. Stockton"), one of Hotels & Inns' attorneys, to discuss a possible global settlement.  As part of this settlement, Mr. Bertzyk proposed that Hotels & Inns engage new counsel to investigate and possibly bring legal malpractice claims against their former attorneys—including Greenberg Traurig's own client and the client representative of FHC, Mr. James—and that, in exchange for LAP settling and compromising all claims it had against Hotels & Inns, LAP would receive the bulk of the net proceeds that Hotels & Inns recovered from any such malpractice lawsuit(s).

61.     In short, Mr. Bertzyk (a partner of GT) solicited Hotels & Inns to turn against their former attorneys, including Greenberg Traurig's own client and the client representative of FHC, Mr. James, and to sue them for damages.

62.     On September 21, 2009, Mr. Bertzyk sent an e-mail to Mr. Stockton (at the same time that Mr. Bonner was diligently working on completing Mr. James' gaming application and while Mr. Tratos was performing legal services for FHC at Mr. James' request), in which Mr. Bertzyk states as follows:  "*No way we let James get out cheap or easy*."  (Emphasis added.)

63.     At the time he wrote that e-mail on September 21, 2009, Mr. Bertzyk had access to Mr. James' confidential financial information, which had been previously disclosed by Mr. James to Mr. Bonner at Greenberg Traurig.  This is because Mr. James' personal, private information was in the possession of Mr. Bonner, Mr. Bertzyk's partner at Greenberg Traurig.

64.     Mr. Bertzyk also solicited litigation against Mr. James from other sources, including, without limitation, the trustee in the Hotels & Inns' bankruptcy proceedings in Nevada, making false and defamatory statements of fact concerning Mr. James along the way, during the same time that Greenberg Traurig was working with Mr. James as the client representative of FHC and representing Mr. James personally in his Nevada gaming application.

65.     On information and belief, Mr. Bertzyk sought and received approval from the chairman of Greenberg Traurig's litigation department to seek to institute litigation against Mr. James based on Mr. James' involvement in the Alexis Park Transaction.  Specifically, Mr. Bertzyk received approval from the highest level of Greenberg Traurig to pursue GT's own client and the client representative of FHC.   Mr. Bertzyk received such approval because, on information and belief, (i) Greenberg Traurig was more concerned with getting paid on its nearly $8,000,000 receivable with LAP than in respecting the duties owed to its clients, FHC and Mr. James, and (ii) Greenberg Traurig was arrogant enough to believe that

1  it could sue its own client (and the client representative of FHC) with impunity.  Thus, this is

2  not the conduct of one lawyer, but rather, of the entire Greenberg Traurig law firm.

3  <u>**LAP Files a Lawsuit Against BHB**</u>

4  66.     On or about January 6, 2010 LAP, through Mr. Coffing of M&A, filed a

5  lawsuit against BHB in the Eighth Judicial District Court, Clark County, Nevada (Case No.

6  A607127), bringing claims for abuse of process, slander of title, intentional interference with

7  contract, and intentional interference with prospective economic advantage, stemming from

8  BHB's work in the Nevada Litigation, the California Litigation, and the Arbitration (the

9  "LAP v. BHB Litigation").

10  67.     On information and belief, Mr. Bertzyk, as lead counsel for LAP, assisted

11  with preparing the Complaint against BHB and acted in concert with Mr. Coffing to pursue

12  BHB (Mr. Coffing had done prior work for LAP alongside Mr. Bertzyk in the Nevada

13  Litigation).  In brief, LAP's claims against BHB stemmed from the findings made against

14  Hotels & Inns' "cohort of lawyers" by the 3-member panel in the Arbitration.

15  68.     According to LAP, BHB was liable for the damages suffered by LAP arising

16  from the Alexis Park Transaction because BHB (and more specifically, Mr. James) was at the

17  forefront of Hotels & Inns' purported scheme to defraud LAP and unsuccessful attempt to

18  take back the property through extensive, protracted litigation.

19  69.     The Complaint in the LAP v. BHB Litigation reeks of the same kind of false

20  and defamatory accusations made by Mr. Bertzyk against Mr. James in the Arbitration

21  (founded on lies, fabrications, and untruths) proclaiming that BHB (*i.e.*, Mr. James) tried to

22  extort LAP on behalf of Hotels & Inns.

23  70.     On January 20, 2010, Mr. Coffing sent a letter to BHB, attaching a draft of the

24  proposed First Amended Complaint.  Mr. James' name appears and is crossed-out in the

25  caption and various places in an obvious effort to intimidate him.

71.     The First Amended Complaint was later filed on February 3, 2010 without including Mr. James as a named defendant.

72.     On March 25, 2010, BHB filed a Special Motion to Dismiss the First Amended Complaint, pursuant to Nevada's Anti-SLAPP statute, NRS 41.660.

73.     On April 30, 2010 LAP filed its Opposition to BHB's Special Motion to Dismiss.  LAP's Opposition relied largely upon a purported "Declaration" prepared by Mr. Bertzyk to argue that BHB's acts in the California Litigation, the Nevada Litigation, and the Arbitration were not undertaken in good faith, but instead, were actionable in tort.

74.     The following false and defamatory statements of fact were made by Mr. Bertzyk against Mr. James—his firm's own client and the client representative of FHC—in his Declaration:

a.     "Our theory of the case in the [A]rbitration was that Bullivant's clients and the lawyers (principally Bullivant) conspired to conjure a false theory to try to take back property whose value had tripled due to [LAP]'s industry and vision or, at the very least, extort from [LAP] a portion of the profits it stood to realize upon sale of the property."

b.     "As discovery would establish, all along (at least since September of 2004, and perhaps sooner), Bullivant attorney Mark James had been working behind the scenes to prepare a lawsuit to seek to rescind the transaction with [LAP] and take back the property that had almost tripled in value."

c.     "On April 20, 2005, the lawyers (including Bullivant attorney James) drafted and had Habash send a letter to [LAP] (i) pretending that the outside payment date was 12 months from the date of closing; and (ii) providing wiring instructions."

d.      "As noted above, however, this was false, and Bullivant knew it was false.  Even so, Bullivant would repeat this falsehood many, many times, including in the

Nevada complaint they later would file and multiple sets of discovery responses Bullivant prepared for its clients to sign."

       e.     "This complaint [from the Nevada Litigation] repeats the same false story about Bullivant's clients supposedly discovering the 60-month outside payment date during the April 22, 2005, lunch with Richard Alter."

       f.     "Later in this declaration, I will discuss proof that these files [from Mr. Driggs' office, sent to Mr. James in early 2005] were altered while in Bullivant's possession."

       g.     "This ruling would open the door for L.A. Pacific to discover that:  (i) the Bullivant-drafted story of their clients being unaware of the 60-month outside payment date prior to April 20, 2005, was a fabrication; and (ii) the Bullivant firm had been working up a case since some time in 2004."

       h.     "Still, and given its protestations of innocence and good faith here, it merits emphasis that Bullivant did far more than wrongfully record lis pendens.  It submitted pleadings that it knew to be false; it wrongfully withheld evidence; and, it altered evidence."

       i.     "I respectfully submit that one need only contrast [a declaration executed by Mr. Habash on December 21, 2005] with Habash's unscripted testimony [during the Arbitration] to appreciate that Habash's lawyers (i.e., Bullivant) were putting words in his mouth."

75.     Mr. James was shocked and abhorred to learn of these lies, fabrications, and untruths, all made against him by one of his own Greenberg Traurig lawyers, Mr. Bertzyk, in the Declaration filed in the LAP v. BHB Litigation.

76.     While Mr. Bertzyk was making such false and defamatory statements of fact concerning Mr. James in the LAP v. BHB Litigation, Mr. James remained a personal client of Greenberg Traurig and the client representative of FHC.  There is no way to justify or

explain Mr. Bertzyk's accusing Mr. James of deceit and dishonesty, while at the same time his partners were contemporaneously (i) preparing to present Mr. James to the GCB and NGC as an honest and reputable person qualified to hold a Nevada gaming license, and (ii) representing the intellectual property interests of FHC, including ensuring that FHC remained suitable to hold privileged licenses to do business in the State of Nevada.

77.     Mr. Bertzyk's attack against Mr. James—Greenberg Traurig's own client and the client representative of FHC—went far beyond drafting this Declaration; he orchestrated Mr. Coffing's oral argument at the hearing on BHB's Special Motion to Dismiss, which took place on May 24, 2010.  Below is a sample of the disturbing statements (each of which is false and defamatory) made by Mr. Coffing in open court regarding Mr. James, urged on by Mr. Bertzyk, who was present and passing notes to Mr. Coffing:

a.     "This is about an attorney [Mr. James] who created a case, who fabricated documents, who fabricated evidence in order to achieve an improper motive [sic], and that is to prevent the sale of a piece of property that they may now have some seller's remorse on a year prior."

b.     "And he [Mr. Habash] goes to his long-time personal attorney, Mark James, and between them they concoct this theory that there was some – there's some fraud in the inducement of this and that Louis Habash in two complaints says:  I never would have agreed to 60 months."

c.     "And as the arbitrators found Mr. Habash's cohort of counsel, blinded by greed for an improper purpose, filed that lawsuit, we believe that we'll show additional improprieties of Mr. James and other Bullivant attorneys as to their motivations in going along with this."

1        d.    "And we believe the evidence will show that Mark James had more

2  involved in this than simply legal fees, and that's why he sent his counsel here today to listen

3  to this."

4        78.    The following exchanges took place between the Court (the Honorable Allan

5  R. Earl) and Mr. Coffing during the hearing on BHB's Special Motion to Dismiss (during

6  which time Judge Earl calls into question the unfounded accusations made against Mr.

7  James):

8        a.    The Court:  "Counsel, what you're doing is arguing to me that Mr.

9  James, arguably one of the most respected lawyers in this community, hatched an illegal

10  scheme.  I mean, you're saying he committed conspiracy and that [he] did illegal acts."  Mr.

11  Coffing:  "I am, Your Honor.  It gives me no pleasure to do so, but that's exactly what I'm

12  saying, and it's inescapable when you look at the evidence here.  And I think what will be

13  clear later on is his motivation for doing so."

14        b.    The Court:  "And that motivation would be?"  Mr. Coffing:  "As the

15  panel found, [he was] blinded by greed.  I could give you my speculation as to why."  The

16  Court:  "Well, I'm not interested in your speculation."

17        c.    Mr. Coffing:  "As for the other – any other litigation regarding Paul

18  Hastings, it's akin to Paul Hastings opened the window and Habash and BHB crawled

19  through the window, raped, and pillaged, and left, so."  The Court:  "Well, now, that's a little

20  emotional, don't you think?"  Mr. Coffing:  "A little.  Sorry.  Pillaged, all right?"

21        d.    The Court:  "Well, one of the things that I'm interested in finding out,

22  and one of the reasons I set this hearing separate from a normal motion calendar, is what do

23  you really expect discovery to elucidate for you?  I mean, bedrock, what you're telling me is

24  that BHB, specifically Mr. James, literally hatched an illegal scheme."   Mr. Coffing:

25  "Correct."

e.      The Court:  "Figured it out on a yellow legal pad here's how we frustrate the legal system, here's how we commit fraud, here's how we fabricate documents, here's how we suborn perjury, here's how we do all these things, and this is how we're going to get your property back."  Mr. Coffing:  "Correct."

f.      The Court:  "That's what you're going to find out?"  Mr. Coffing: "I'm going to find out the reason why he did it too, Your Honor.  And counsel doesn't want me to speculate, so I won't, but I think it's --- will become clear.  This isn't a situation where Mark James sat back and said:  I can get another $300 an hour if I do this.  It's much more than that."

79.      At the conclusion of the May 24, 2010 hearing, Judge Earl granted BHB's Special Motion to Dismiss, which operates as an adjudication on the merits, finding that BHB and Mr. James' conduct constituted protected activity under NRS 41.635 *et seq.*  Thus, LAP's lawsuit (prepared at the hands of Mr. Bertzyk) against BHB was an abuse of the judicial process.

80.      Despite this devastating loss, Mr. Bertzyk's unfounded attacks against Mr. James did not stop.  On July 29, 2010, LAP filed a Motion for Reconsideration, accusing Mr. James of multiple instances of impropriety.  Although filed by Mr. Coffing, on information and belief, this motion was prepared by Mr. Bertzyk, who continued unabated in acting against the interests of his firm's own clients, FHC and Mr. James.  On February 22, 2011, the dismissal was reversed and the case is still being prosecuted against BHB.

81.      On information and belief, Mr. Bertzyk remains undeterred in his effort to generate new litigation against Mr. James relating to the Alexis Park Transaction (with the $8,000,000 receivable hanging over his head), and continues to make false and defamatory statements of fact concerning Mr. James to third parties similar to those described herein.

82.     Mr. Bertzyk's remarks in the LAP v. BHB Litigation are detrimental to FHC, because he has potentially jeopardized FHC's otherwise unquestioned suitability to hold privileged licenses to do business in the State of Nevada by attacking its President and CEO (through lies, fabrications, and untruths) with unrestrained venom.   These continuous and ongoing statements and actions against Mr. James and the related allegations are adversely impacting and damaging both FHC and Mr. James.

83.     Specifically, FHP and Mr. James were required to retain Snell & Wilmer, LLP and Baker Botts, LLP to work with Bullivant's attorneys in defense of litigation that was directed at or substantially related to FHP's President and CEO, Mr. James.   The allegations are of the nature and type that required FHP and Mr. James to retain counsel and to defend against the same with BHP.    To date, FHP incurred fees and costs from Snell & Wilmer, LLP related to this defense in excess of $200,000.00.   To date Mr. James has incurred fees and costs from Baker Botts, LLP related to this defense in excess of $150,000.00.   Given the nature and reprehensibleness of the allegations, both FHP and Mr. James were required to retain counsel to assist in addressing the same and in order to protect their business standing, ongoing business relations, and reputations.

**LAP Files a Lawsuit Against Paul Hastings**

84.     In a stunning turn of events, on April 15, 2010, LAP filed a lawsuit against Paul Hastings in the Superior Court of California, County of Los Angeles (Case No. BC435893), for legal malpractice, breach of fiduciary duty, and breach of contract (the "LAP v. Paul Hastings Litigation").   LAP is represented in this litigation by the law firm of Greene Broillet & Wheeler, LLP, though, on information and belief, Mr. Bertzyk remains actively involved as principal counsel for LAP.

85.     LAP claims in this lawsuit that Paul Hastings, *i.e.*, Messrs. Kirkbride and Katz, failed to exercise reasonable care and skill in performing legal services as requested,

1  expected and/or bargained for by LAP relating to the Alexis Park Transaction. In this case,

2  LAP disclosed for the first time the existence of the Tolling Agreement with Paul Hastings,

3  which pre-dates the Arbitration.

4        86.     LAP filed a First Amended Complaint against Paul Hastings on July 27, 2010.

5  This time, LAP described in greater detail the wrongs committed by Paul Hastings. In brief,

6  LAP alleged that Paul Hastings failed to protect LAP from claims arising out of the Alexis

7  Park Transaction by the sellers and that Paul Hastings attempted to take advantage of LAP's

8  tenuous position to negotiate limits on its own exposure for malpractice. Specifically, LAP

9  alleges that Paul Hastings failed to take reasonable measures to ensure that the signed

10  contract documents evidenced a 60-month outside payment date and failed to ensure that the

11  sellers could not disavow previously agreeing to be bound by this last-minute change to the

12  documents. Thus, according to LAP, Paul Hastings left its client vulnerable to Hotels & Inns

13  bringing colorable claims against LAP relating to the 12-month versus 60-month holdback

14  issue.

15        87.     The First Amended Complaint filed by LAP also reveals why LAP turned to

16  Greenberg Traurig and Mr. Bertzyk for assistance: Paul Hastings allegedly refused to

17  recognize the plight in which LAP had been placed and would not bear a portion of the fees

18  and costs associated with defending LAP against the claims brought by Hotels & Inns.

19        88.     It is clear from the lawsuit filed by LAP against Paul Hastings that LAP has

20  now taken a position directly contrary to that which it had taken in the Arbitration (through

21  Mr. Bertzyk) regarding Paul Hastings' work on the Alexis Park Transaction; specifically, in

22  the Arbitration, LAP contended that Paul Hastings had documented Mr. Habash's purported

23  assent on behalf of Hotels & Inns to a 60-month outside payment date. In the LAP v. Paul

24  Hastings Litigation, LAP claims that Paul Hastings failed to do so.

25

89.     LAP filed a Second Amended Complaint against Paul Hastings on October 15, 2010.  In so doing, LAP added additional allegations against its former firm, including, without limitation, (i) that Paul Hastings failed to disclose to LAP for one year that it committed errors in preparing the Alexis Park Transaction documents, (ii) that Paul Hastings did not properly collate those documents to show that a change in the outside payment date had been made, (iii) that Messrs. Kirkbride and Katz prepared false declarations blaming LAP for the errors, and (iv) that Paul Hastings refused to produce metadata showing that changes were allegedly made to the transaction documents to reflect the sellers' agreement to a 60-month holdback provision.

90.     LAP has now judicially admitted that Messrs. Kirkbride and Katz made *misrepresentations* in the Arbitration and underlying litigation arising from the Alexis Park Transaction, despite all of the contentions made by LAP (through Mr. Bertzyk) to the contrary.  These admissions by LAP raise serious doubts regarding the legitimacy of the award issued by the 3-member panel in the Arbitration because the averments made in the Second Amended Complaint flatly conflict with positions taken by LAP (through Mr. Bertzyk) in the Arbitration.

91.     On information and belief, Mr. Bertzyk knew about (or had reason to know about) Paul Hastings' failures with respect to the Alexis Park Transaction, yet did nothing to reveal this information at the Arbitration, but instead, concealed and/or relied upon it to his advantage.

92.     On information and belief, Mr. Bertzyk authored, in whole or in part, the pleadings in the LAP v. Paul Hastings Litigation.  In short, this means—if one believes the allegations made in the LAP v. Paul Hastings Litigation to be true—that the allegations made by Mr. Bertzyk against his firm's own client and the client representative of FHC, Mr. James, were false and known by Mr. Bertzyk to be false when made and when repeated.

**FHC and Mr. James Lose the Business Opportunity to Purchase A Cab, LLC**

93.     The Las Vegas taxicab market is a closely regulated market.   Any increase in market share has a significant impact on the profitability of FHC in the Las Vegas market. FHC has a specific and limited percentage of the total Las Vegas market share.

94.     A Cab, LLC, a Nevada limited liability company, which holds Certificate of Public Convenience and Necessity ("Certificate") CPCT 1052 issued by the Nevada Taxicab Authority ("Authority").  This Certificate authorizes A Cab, LLC  to transport passengers and their baggage in taxicab service between points and places in Clark County, Nevada.  A Cab, LLC is also the owner and holder of approximately sixty-three (63) taxicab medallions duly issued by the Authority for this purpose.

95.     On or about July of 2009, Creighton J. Nady (the owner of A Cab, LLC) initiated discussions with Mr. James regarding a potential sale of A Cab, LLC to FHC.

96.     Mr. Nady specifically approached FHC because he knew that Mr. James had been recently approved by the Authority to be "fit, willing and able to perform the services of a taxicab motor carrier," and therefore he believed a sale to FHC would receive rather quick regulatory approval.

97.     A Joint Application of A Cab, LLC and FHC for approval of the Transfer Certificate was drafted and prepared by the parties.

98.     On or about May 4, 2010, Mr. Nady met with Gordon Walker, who at that time was the Administrator of the Authority, and Scott Davis, the Authority's Deputy Attorney General.

99.     At that meeting, Mr. Nady inquired of Mr. Walker about an estimated timeline for regulatory approval in the event he decided to sell A Cab, LLC to FHC.

100.     At the meeting, Mr. Nady was informed by Mr. Walker that any sale to FHC would take longer as the Authority would require a full investigation into the allegations

being made against Mr. James, or words to that affect, before any recommendation could be made to the Authority concerning the approval of a sale to FHC.

101.   Upon information and belief the clear implication of Mr. Walker's communication was that the sale of A Cab, LLC to FHC was improbable at best.

102.   Because of the Authority's position concerning the extended time frame for any sale and the sales dependence upon an investigation by the Authority into allegations being made against Mr. James, on or about August 4, 2010, A Cab, LLC terminated the proposed sale of A Cab, LLC to FHC.

103.   The loss of the A Cab, LLC sale to FHC caused FHC damages in excess of $500,000.00 for the first year and increasing substantially on an annual basis thereafter.  Any increase in market share has a significant impact on the profitability of FHC in the Las Vegas market.  This same loss had a direct financial impact and caused damages to Mr. James.  Mr. James owns 48% of FHC and the loss of A Cab resulted in damages to Mr. James vis-à-vis his ownership interest in FHC.

### FHC, Ms. Frias, and Mr. James Terminate Their Respective Attorney-Client Relationships with Greenberg Traurig

104.   Upon fully discovering the misconduct of GT and Mr. Bertzyk, on August 13, 2010, FHC, Ms. Frias, and Mr. James terminated their respective relationships with Greenberg Traurig.

105.   Notwithstanding, and despite all of the foregoing, on September 17, 2010, GT wrote a letter to counsel for FHC and Mr. James (Gregory Brower, Esq. and Neal Tomlinson, Esq. of the law firm of Snell & Wilmer, LLP), declaring that neither Mr. Bertzyk nor any other member of GT had committed any breach of fiduciary duty owed to FHC or Mr. James or violated any of the duties owed to FHC or Mr. James pursuant to the Nevada Rules of Professional Conduct.  The assertions made by Greenberg Traurig in the September 17, 2010 letter are absolutely and irredeemably false.

106.     Based on the acts and omissions described above, Greenberg Traurig and Mr. Bertzyk breached their duties owed to FHC as follows:

a.     By failing to competently represent the interests of FHC, in violation of Nevada R.P.C. 1.1;

b.     By failing to communicate with FHC, in violation of Nevada R.P.C. 1.4;

c.     By creating a significant risk that the representation of FHC (owned in part and operated by Mr. James) would be materially limited by the duties owed to another client (LAP), in violation of Nevada R.P.C. 1.7;

d.     By failing to withdraw from representing LAP upon continuing to represent FHC once Mr. James became its President and CEO, in violation of Nevada R.P.C. 1.16;

e.     By failing to exercise independent professional judgment in representing FHC, in violation of Nevada R.P.C. 2.1;

f.     By knowingly making false and defamatory statements of fact concerning FHC's President and CEO, Mr. James, while simultaneously representing FHC in various intellectual property matters, in violation of Nevada R.P.C. 4.1(a); and

g.     By failing to take reasonable measures to ensure that all members of Greenberg Traurig were honoring their duties owed to FHC as a client, as required by Nevada R.P.C. 5.1.

107.     Based on the acts and omissions described above, Greenberg Traurig and Mr. Bertzyk breached their duties owed to Mr. James as follows:

a.     By concurrently representing a client (LAP) with interests materially adverse to those of Mr. James, in violation of Nevada R.P.C. 1.7;

b.     By representing a client (LAP) with interests materially adverse to those of a former client (Mr. James), in violation of Nevada R.P.C. 1.9;

c.     By failing to maintain or to take reasonable measures to prevent the improper use of confidential information revealed by Mr. James to Greenberg Traurig in connection with preparing his gaming application, in violation of Nevada R.P.C. 1.6;

d.     By using information obtained during Greenberg Traurig's representation of Mr. James (specifically, his confidential personal and financial information) to the disadvantage of Mr. James without his consent, in violation of Nevada R.P.C. 1.8(b);

e.     By failing to withdraw from representing LAP upon commencing representation of Mr. James personally, in violation of Nevada R.P.C. 1.16;

f.     By failing to exercise independent professional judgment in representing Mr. James, in violation of Nevada R.P.C. 2.1;

g.     By knowingly making false and defamatory statements of fact concerning Mr. James while representing him, in violation of Nevada R.P.C. 4.1(a); and

h.     By failing to take reasonable measures to ensure that all members of Greenberg Traurig were honoring their duties owed to Mr. James as a client, as required by Nevada R.P.C. 5.1.

108.   Greenberg Traurig is liable under the doctrine of *respondeat superior* for all of the acts and omissions complained of herein and injuries and damages caused thereby because the conduct of Mr. Bertzyk was committed within the course and scope of his employment as a lawyer of GT.  Greenberg Traurig is further responsible for the conduct of Mr. Bertzyk pursuant to Nevada Rules of Professional Conduct 1.10 and 5.1.

**FIRST CAUSE OF ACTION**
**(Legal Malpractice)**

109.   FHC and Mr. James reallege and incorporate by reference the averments contained in Paragraphs 1-107, inclusive, as though fully set forth herein.

110.    GT and Mr. Bertzyk owed duties to FHC based on the creation and existence of an attorney-client relationship between FHC and GT, which began in or around September 2008, if not earlier, and continued until August 13, 2010.

111.    GT and Mr. Bertzyk owed duties to Mr. James based on the creation and existence of an attorney-client relationship between Mr. James and GT, which began on July 14, 2009, if not earlier, and continued until August 13, 2010.

112.    GT and Mr. Bertzyk owed duties to FHC and Mr. James as clients to use such skill, prudence, and diligence as lawyers of ordinary and reasonable skill and capacity possess in exercising and performing tasks which they agree to undertake on behalf of their clients.

113.    GT and Mr. Bertzyk breached their duties owed to FHC and Mr. James as described above.

114.    While GT was representing Mr. James on his application for a gaming license, the success of which requires a demonstrably impeccable record of honesty, good character, and integrity, GT was filing documents and making statements falsely charging Mr. James with fraud, deceit, and dishonesty, as well as privately soliciting litigation against him.  All the while, GT had full and complete access to Mr. James' personal and financial information due to the scope of GT's individual representation of Mr. James.  Further, GT was putting FHC's otherwise unquestioned right to hold privileged licenses to do business in the State of Nevada at risk by encouraging Mr. Bertzyk's attacks against the character of FHC's President and CEO, Mr. James.

115.    Mr. Bertzyk performed the acts complained of herein with the intent to advance his own interests and the interests of GT, without consideration for respecting or defending the interests of FHC or Mr. James.

116.    The acts of Defendants, and each of them, were characterized by fraud, oppression, or malice, express or implied, which justifies an award of punitive damages.

117.    The acts and/or omissions complained of herein were the direct and proximate cause of damages sustained by FHC and Mr. James.

118.    As a direct and proximate result of Defendants' knowing, intentional, reckless and/or negligent breach of duties, FHC and Mr. James have suffered, and will continue to suffer the loss of business and business opportunities, and damages in an amount to be proven at trial, said amount being in excess of one hundred thousand dollars ($100,000).

119.    FHC and Mr. James were forced to retain the services of legal counsel to prosecute this claim, and therefore, are entitled to attorneys' fees related to this action.

### SECOND CAUSE OF ACTION
#### (Breach of Fiduciary Duty)

120.    FHC and Mr. James reallege and incorporate by reference the averments contained in Paragraphs 1-107, inclusive, as though fully set forth herein.

121.    FHC had a fiduciary relationship with GT and Mr. Bertzyk predicated on trust and confidence, stemming from the creation and existence of an attorney-client relationship between FHC and GT, which began in or around September 2008, if not earlier, and continued until August 13, 2010.

122.    Mr. James had a fiduciary relationship with GT and Mr. Bertzyk predicated on trust and confidence, stemming from the creation and existence of an attorney-client relationship between Mr. James and GT, which began on July 14, 2009, if not earlier, and continued until August 13, 2010.

123.    FHC and Mr. James each reposed a great amount of trust and confidence in GT in representing and defending their interests as part of creating and maintaining their respective attorney-client relationships.

124.   GT accepted the trust and confidence reposed in it by FHC and Mr. James to zealously represent and defend their interests.

125.   GT and Mr. Bertzyk owed fiduciary duties to FHC and Mr. James as clients to be open and honest with them and to remain faithful and loyal to them.

126.   GT and Mr. Bertzyk failed to act as fiduciaries and breached their duties owed to FHC and Mr. James as described above.

127.   By representing LAP, Mr. Bertzyk and GT created a significant risk that the representation of FHC and Mr. James would be materially limited based on duties owed by Mr. Bertzyk and GT to LAP (another client of the same firm).

128.   Mr. Bertzyk should not have been representing a client (LAP) with interests materially adverse to those of FHC and Mr. James, while Messrs. Tratos and Bonner were simultaneously representing FHC and Mr. James, respectively, and by so doing, GT and Mr. Bertzyk violated a fiduciary duty owed to FHC and Mr. James.

129.   GT and Mr. Bertzyk committed the acts described herein in violation of the confidential relationship existing among GT, FHC, and Messrs. Bertzyk and James, in order to benefit one client (LAP), to the detriment of other clients (FHC and Mr. James).

130.   The acts of Defendants, and each of them, were characterized by fraud, oppression, or malice, express or implied, which justifies an award of punitive damages.

131.   As a direct and proximate result of Defendants' knowing, intentional, reckless and/or negligent breach of duties, FHC and Mr. James have suffered, and will continue to suffer the loss of business and business opportunities, and damages in an amount to be proven at trial, said amount being in excess of one hundred thousand dollars ($100,000).

132.   FHC and Mr. James were forced to retain the services of legal counsel to prosecute this claim, and therefore, are entitled to attorneys' fees related to this action.

**THIRD CAUSE OF ACTION**
**(Professional Negligence)**

133.    FHC and Mr. James reallege and incorporate by reference the averments contained in Paragraphs 1-107, inclusive, as though fully set forth herein.

134.    GT and Mr. Bertzyk owed duties of care and loyalty to FHC based on the creation and existence of an attorney-client relationship between FHC and GT, which began in or around September 2008, if not earlier, and continued until August 13, 2010.

135.    GT and Mr. Bertzyk owed duties of care and loyalty to Mr. James based on the creation and existence of an attorney-client relationship between Mr. James and GT, which began on July 14, 2009, if not earlier, and continued until August 13, 2010.

136.    GT and Mr. Bertzyk breached those duties of care and loyalty owed to FHC and Mr. James as described above.

137.    The multiple breaches committed by GT and Mr. Bertzyk were the legal cause of injuries and damages suffered by FHC and Mr. James.

138.    As a direct and proximate result of Defendants' knowing, intentional, reckless and/or negligent breach of duties, FHC and Mr. James have suffered, and will continue to suffer the loss of business and business opportunities, and damages in an amount to be proven at trial, said amount being in excess of one hundred thousand dollars ($100,000).

139.    FHC and Mr. James were forced to retain the services of legal counsel to prosecute this claim, and therefore, are entitled to attorneys' fees related to this action.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract)**

140.    FHC and Mr. James reallege and incorporate by reference the averments contained in Paragraphs 1-107, inclusive, as though fully set forth herein.

141.     FHC and GT entered into a valid and existing contract through execution of an engagement letter, which was effective retroactively to the time when GT first started performing legal services for FHC.

142.     Mr. James and GT entered into a valid and existing contract through execution of an engagement letter, which was effective retroactively to the time when GT first started performing legal services for Mr. James personally.

143.     FHC performed as required under the terms of the engagement letter, save and except where its performance was excused.

144.     Mr. James performed as required under the terms of the engagement letter, save and except where his performance was excused.

145.     GT breached one or more terms of the engagement letter with FHC by, among other acts:

     a.     Violating several duties owed to FHC as prescribed by the Nevada Rules of Professional Conduct (described above);

     b.     Violating the duties of loyalty and trust owed to FHC, as described above;

     c.     Violating duties of competence and care owed to FHC, as described above;

     d.     Representing a client (LAP), which consequently created a significant risk that the representation of FHC would be materially limited; and

     e.     Making false and defamatory statements of fact concerning Mr. James—the President and CEO of FHC—which placed FHC in jeopardy with its regulators.

146.     GT breached one or more terms of the engagement letter with Mr. James by, among other acts:

a.    Violating several duties owed to Mr. James as prescribed by the Nevada Rules of Professional Conduct (described above);

b.    Violating the duties of loyalty and trust owed to Mr. James, as described above;

c.    Violating duties of competence and care owed to Mr. James, as described above;

d.    Representing a client (LAP) with interests materially adverse to those of Mr. James;

e.    Disclosing (or granting access to and creating the appearance of disclosing) confidential information obtained from Mr. James to a third party without his consent or approval;

f.    Improperly using (or granting access to and creating the substantial risk of improper use of) Mr. James' confidential information to benefit LAP;

g.    Inciting or soliciting litigation against Mr. James; and

h.    Making false and defamatory statements of fact concerning Mr. James.

147.    As a direct and proximate result of Defendants' knowing, intentional, reckless and/or negligent breach of duties, FHC and Mr. James have suffered, and will continue to suffer the loss of business and business opportunities, and damages in an amount to be proven at trial, said amount being in excess of one hundred thousand dollars ($100,000).

148.    FHC and Mr. James were forced to retain the services of legal counsel to prosecute this claim, and therefore, are entitled to attorneys' fees related to this action.

**FIFTH CAUSE OF ACTION**
**(Contractual Breach of the Implied Covenant of Good Faith and Fair Dealing)**

149.    FHC and Mr. James reallege and incorporate by reference the averments contained in Paragraphs 1-107, inclusive, as though fully set forth herein.

150.    FHC and GT entered into a valid and existing contract through execution of an engagement letter, which was effective retroactively to the time when GT first started performing legal services for FHC.

151.    Mr. James and GT entered into a valid and existing contract through execution of an engagement letter, which was effective retroactively to the time when GT first started performing legal services for Mr. James personally.

152.    GT owed a duty of good faith and fair dealing to FHC and Mr. James arising from their respective engagement letters, which meant that GT and its member attorneys would not act in such a way as to deliberately contravene the intention and spirit of the respective engagement letters.

153.    GT breached its duty of good faith and fair dealing owed to FHC and Mr. James by engaging in the misconduct described above through its member attorneys, and/or by failing to take preventative measures to avoid injury or harm to its clients, FHC and Mr. James.

154.    As a direct and proximate result of Defendants' knowing, intentional, reckless and/or negligent breach of duties, FHC and Mr. James have suffered, and will continue to suffer the loss of business and business opportunities, and damages in an amount to be proven at trial, said amount being in excess of one hundred thousand dollars ($100,000).

155.    FHC and Mr. James were forced to retain the services of legal counsel to prosecute this claim, and therefore, are entitled to attorneys' fees related to this action.

**SIXTH CAUSE OF ACTION**
**(Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing)**

156.    FHC and Mr. James reallege and incorporate by reference the averments contained in Paragraphs 1-107, inclusive, as though fully set forth herein.

157.   FHC and GT entered into a valid and existing contract through execution of an engagement letter, which was effective retroactively to the time when GT first started performing legal services for FHC.

158.   Mr. James and GT entered into a valid and existing contract through execution of an engagement letter, which was effective retroactively to the time when GT first started performing legal services for Mr. James personally.

159.   GT owed a duty of good faith and fair dealing to FHC and Mr. James arising from their respective engagement letters, which meant that GT and its member attorneys would not act in such a way as to deliberately contravene the intention and spirit of the respective engagement letters.

160.   A special element of reliance or fiduciary duty existed (i) between FHC and GT, and (ii) between Mr. James and GT, because GT and its member attorneys were placed in a superior or entrusted position with respect to FHC and Mr. James by agreeing to represent them as their attorneys.

161.   GT tortiously breached its duty of good faith and fair dealing owed to FHC and Mr. James by engaging in the misconduct described above through its member attorneys, and/or by failing to take preventative measures to avoid injury or harm to their clients, FHC and Mr. James.

162.   As a direct and proximate result of Defendants' knowing, intentional, reckless and/or negligent breach of duties, FHC and Mr. James have suffered, and will continue to suffer the loss of business and business opportunities, and damages in an amount to be proven at trial, said amount being in excess of one hundred thousand dollars ($100,000).

163.   FHC and Mr. James were forced to retain the services of legal counsel to prosecute this claim, and therefore, are entitled to attorneys' fees related to this action.

**SEVENTH CAUSE OF ACTION**
**(Deceptive Trade Practices)**

164.    FHC and Mr. James reallege and incorporate by reference the averments contained in Paragraphs 1-107, inclusive, as though fully set forth herein.

165.    The conduct of GT and Mr. Bertzyk violates the Nevada Deceptive Trade Practices Act, NRS Chapter 598; specifically:

   a.    Disparaging the services and business of FHC by making false and misleading representations of fact concerning its President and CEO, Mr. James, in violation of NRS 598.0915(8);

   b.    Knowingly making false representations in the transactions with FHC and Mr. James for the performance of legal services, in violation of NRS 598.0915(15);

   c.    Knowingly failing to disclose material facts in connection with the sale of their services, in violation of NRS 598.0923(2);

   d.    Knowingly violating regulations relating to the sale of their services, in violation of NRS 598.0923(3); and

   e.    Knowingly using coercion, duress or intimidation in connection with the sale and providing of their services, in violation of NRS 598.0923(4).

166.    GT and Mr. Bertzyk had a statutory duty to refrain from committing deceptive trade practices in the course of their business.

167.    Mr. James and FHC are entitled, pursuant to NRS 41.600(2)(e), to pursue these claims for relief as victims of consumer fraud.

168.    As a direct and proximate result of Defendants' knowing, intentional, reckless and/or negligent breach of duties, FHC and Mr. James have suffered, and will continue to suffer the loss of business and business opportunities, and damages in an amount to be proven at trial, said amount being in excess of one hundred thousand dollars ($100,000).

169.   FHC and Mr. James were forced to retain the services of legal counsel to prosecute this claim, and therefore, are entitled to attorneys' fees related to this action.

WHEREFORE, FHC and Mr. James pray for the following relief:

1.   Judgment in favor of FHC and Mr. James against GT and Mr. Bertzyk on the First Cause of Action in an amount to be proven at trial;

2.   Judgment in favor of FHC and Mr. James against GT and Mr. Bertzyk on the Second Cause of Action in an amount to be proven at trial;

3.   Judgment in favor of FHC and Mr. James against GT and Mr. Bertzyk on the Third Cause of Action in an amount to be proven at trial;

4.   Judgment in favor of FHC and Mr. James against GT on the Fourth Cause of Action in an amount to be proven at trial;

5.   Judgment in favor of FHC and Mr. James against GT on the Fifth Cause of Action in an amount to be proven at trial;

6.   Judgment in favor of FHC and Mr. James against GT on the Sixth Cause of Action in an amount to be proven at trial;

7.   Judgment in favor of FHC and Mr. James against GT, as well as against GT's officers, managing agents and other culpable persons, on the Seventh Cause of Action for actual losses and for treble damages pursuant to NRS 598.0999(3);

8.   Forfeiture and Disgorgement of all fees paid by Mr. James to GT;

9.   For an award of punitive damages against GT and Mr. Bertzyk in an amount to be proven at trial;

10.   For an award of costs and attorneys' fees reasonably incurred by FHC and Mr. James in bringing this action pursuant to NRS 41.600(3)(b) and as otherwise permitted by law;

11.     For an award of prejudgment interest at the highest rate allowed by law until paid in full; and

12.     For such other and further relief as the Court deems just and proper.

DATED this 12th day of October, 2011.

CARBAJAL & MCNUTT, LLP


*/s/ Daniel R. McNutt*
DANIEL R. MCNUTT
Nevada Bar No. 7815
625 South Eighth Street
Las Vegas, Nevada 89101

Attorney for Plaintiffs
*Frias Holding Company and Mark A. James*

1

## <u>CERTIFICATE OF MAILING</u>

2        I HEREBY CERTIFY that on the 12th day of October, 2011, I caused service of the

3  foregoing **FIRST AMENDED COMPLAINT** by mailing a copy by United States Postal

4  Service, postage prepaid and/or via electronic mail through the United States District Court's

5  CM/ECF system to the following at their last known address and e-mail:

6  Kirk B. Lenhard
    BROWNSTEIN HYATT FARBER SCHRECK, LLP
7  100 North City Parkway, Suite 1600
    Las Vegas, Nevada 89106
8  klenhard@bhfs.com

9  Michael P. McNamara
    Dylan Ruga
10  STEPTOE & JOHNSON, LLP
    2121 Avenue of the Stars, Suite 2800
11  Los Angeles, California 90067
    mmcnamara@steptoe.com
12  druga@steptoe.com
    Attorneys for Defendants

13

14                         */s/ Lisa A. Heller*

15                         An Employee of Carbajal & McNutt LLP

16

17

18

19

20

21

22

23

24

25